NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 22-7168

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

DISTRICT OF COLUMBIA, *et al.*,
APPELLANTS,

V.

THE KROGER CO., *et al.*,
APPELLEES.

ON APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**APPELLANTS' OPPOSITION TO APPELLEES'
CROSS-MOTIONS FOR SUMMARY AFFIRMANCE**

Appellees cannot pass this Court's exacting test for summary affirmance. Such relief is improper unless movants carry the "heavy burden" of showing that an appeal is so clearly meritless that no benefit could be gained from full briefing and argument. *Webster v. Del Toro*, 49 F.4th 562, 566 n.1 (D.C. Cir. 2022). But while the facts of this case may be novel, the errors in the district court's decision are straightforward. Albertsons Companies, Inc. and the Kroger Company are rival supermarkets. They have agreed to restrict Albertsons's access to credit, and limit its ability to refinance existing debt, after it pays an unprecedented cash-depleting

$4 billion dividend as part of a proposed merger.  That is a combination between rivals (concerted action) that will diminish competition with no procompetitive benefit (unreasonably restraining trade).  Such arrangements have violated the antitrust laws for more than a century.  *See, e.g.*, *Northern Sec. Co. v. United States*, 193 U.S. 197, 328-32, 353-54 (1904) (plurality op.).  The district court's contrary conclusion was a legally erroneous basis for denying preliminary injunctive relief.

Albertsons and Kroger cannot obscure this simple truth by overstating the (largely irrelevant) idiosyncrasies of their transaction.  Their capital-depleting agreement is unlawful even if formed partly through acquiescence, *see United States v. Masonite Corp.*, 316 U.S. 265, 276 (1942); even if the harm to competition is unintentional, *see McLain v. Real Estate Bd. of New Orleans*, 444 U.S. 232, 243 (1980); and even if aspects of the arrangement, viewed in isolation, appear unilateral, *see Poller v. CBS, Inc.*, 368 U.S. 464, 468-69 (1962).  The merger agreement's $4 billion special dividend and interrelated credit and debt restrictions form an anticompetitive one-two punch that the antitrust laws simply do not tolerate.

But even if blackletter law did not straightforwardly condemn Albertsons and Kroger's combination, that is all the more reason to *not* summarily affirm.  By Albertsons and Kroger's own admissions, the $4 billion dividend is a key part of their proposed merger, which they have memorialized in a written contract that expressly limits Albertsons's ability to borrow money and refinance existing debt.

*See* pp. 5-8, *infra*.  The district court at least *arguably* erred in failing to recognize that this arrangement constitutes anticompetitive concerted action, especially given Albertsons's and Kroger's inability to muster even a single procompetitive justification for it.  The court likewise at least *arguably* erred in overlooking the significant public interest in preventing such irreparable anticompetitive harms from arising during this suit, all of which dwarf any private interests that may be affected.  For these reasons alone, summary affirmance is improper in this case.

## BACKGROUND

### 1.    Legal Background.

The antitrust principles in this case are the same under federal, state, and District law.    Section 1 of the Sherman Act outlaws "[e]very contract, combination . . . or conspiracy" that unreasonably restrains trade.  15 U.S.C. § 1; *see* 740 Ill. Comp. Stat. 10/3; D.C. Code §§ 28-4502, 28-4515.  This law forbids all concerted action that unreasonably hinders competition or that seeks to eliminate the threat of competition.  *FTC v. Actavis, Inc.*, 570 U.S. 136, 147-60 (2013).

Concerted action "is different from and antecedent to the question" of whether a combination "unreasonably restrains trade."  *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 186 (2010).  Concerted action refers to arrangements that join "independent centers of decisionmaking."  *Id.* at 189 (internal quotation marks omitted).  This can arise through merger agreements.  *United States v. Rockford Mem'l Corp.*, 898 F.2d

1278, 1282-83 (7th Cir. 1990). It can be formed through "acquiescence." *Masonite*, 316 U.S. at 276. Or it can be inferred from "conduct that in context suggests that each competitor failed to make an independent decision." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 241 (1996); *United States v. Singer Mfg. Co.*, 374 U.S. 174, 194 (1963) (holding "concerted action" arose "implicitly from the course of dealing"); *Interstate Cir. v. United States*, 306 U.S. 208, 227 (1939) (similar, rivals accepted "an invitation to participate in a plan," even "without previous agreement").

Generally, Section 1 claims are analyzed under quick-look review or the rule of reason. Quick look applies where a restraint's "anticompetitive character" requires "no elaborate industry analysis." *FTC v. Indiana Fed'n of Dentists* (*IFD*), 476 U.S. 447, 459 (1986). Under that standard, courts will find an antitrust violation where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect." *Cal. Dental Ass'n v. FTC* (*CDA*), 526 U.S. 756, 770 (1999).

The rule of reason involves a flexible burden-shifting framework. *NCAA v. Alston*, 141 S. Ct. 2141, 2160-61 (2021). First, plaintiffs must show that the challenged conduct has anticompetitive effects. *Id.* Second, defendants must carry the "heavy burden" of showing a procompetitive justification. *NCAA v. Bd. of Regents*, 468 U.S. 85, 113 (1984). Finally, if defendants satisfy step two, plaintiffs

must explain how the same procompetitive benefit could reasonably be achieved through substantially less restrictive means. *Alston*, 141 S. Ct. at 2160-62.

## 2.    Factual Background.

### A.    Albertsons and Kroger execute a merger agreement that involves credit and debt restrictions and a $4 billion special cash dividend.

On October 13, 2022, Albertsons and Kroger executed a merger agreement. The proposed merger would make Albertsons "a wholly owned direct subsidiary of" Kroger, and thus combine two of the largest supermarket chains in the country and direct rivals in the District of Columbia, California, and Illinois.  Agreement 1, 23 § 2.2; *see* Compl. ¶13, 36, 41-42, 51, 53 (Dkt.1).  The merger agreement was "jointly prepared," and Albertsons's and Kroger's boards each unanimously "approved and declared advisable" the agreement, the proposed merger, and "other transactions contemplated hereby."  Agreement 1, 21 § 1.2(j).

One of the "transactions contemplated" by the merger agreement is "a Pre-Closing Dividend."  Agreement 1.  Albertsons and Kroger defined "the Pre-Closing Dividend" to mean "one or more special cash dividends payable to" Albertsons's shareholders "in an amount not to exceed with respect to all such special cash dividends $4,000,000,000 in the aggregate."  Agreement 1, 16 § 1.1.  This $4 billion dividend is 57 times greater than Albertsons's usual dividends; it is more than half of Albertsons's $6 billion annual liquidity needs; and it represents more than one-third of Albertsons's $11 billion total market capitalization.  Compl. ¶¶24-25, 35.

Albertsons plans to pay for the special dividend with $2.5 billion in cash and $1.5 billion borrowed from a revolving credit facility at an interest rate of LIBOR plus 1.25% to 1.5%. Compl. ¶59; Smith Decl. ¶19.f.i (Dkt.37-2); Weisbach Decl. ¶14 (Dkt.56-1).[1] Taking those steps would reduce Albertsons's cash on hand to $500 million, Weisbach Decl. ¶14, and increase Albertsons's net debt from $4.54 billion to $8.54 billion, Compl. ¶60.

Albertsons and Kroger negotiated the details of this $4 billion special dividend and made it part of their merger agreement. *See* Appellants' Emergency Mot. 3-5 (Dec. 13, 2022). Albertsons officially "declared a Pre-Closing Dividend" in the same recitals in which it and Kroger approved all "transactions contemplated" by the merger agreement. Agreement 1. Albertsons and Kroger also defined the merger's consideration in relevant part as $34.10 per share minus the "per share amount of the Pre-Closing Dividend." Agreement 3, 13 § 1.1. They further agreed that if the merger's "Closing Date occurs" before payment of "the Pre-Closing Dividend," then Kroger "shall cause" Albertsons as "the Surviving Corporation to pay, the Pre-Closing Dividend." Agreement 31 § 3.3(i); *see id.* 23 § 2.2.

In conjunction with the $4 billion special dividend, the merger agreement also prohibits Albertsons from making certain business decisions. In particular, it

---

[1]    LIBOR refers to the London Interbank Offered Rate.

provides that Albertsons cannot "incur" or "otherwise become liable for any Indebtedness" without Kroger's "prior written consent."   Agreement 59, 61-62 § 6.1(n)(i).   Under this provision, Albertsons cannot borrow money from its revolving credit facility unless doing so is "in the ordinary course of business consistent with past practice." Agreement 59, 61-62 §§ 6.1(n)(i)(A), 6.1(n)(i)(F)(w). Nor can Albertsons refinance any existing debts having "a principal amount exceeding $100,000,000," unless it "has reasonably consulted with" Kroger "prior to" such refinancing.   Agreement 59, 61-62 § 6.1(n)(i)(F)(y).

**B.    Albertsons and Kroger jointly announce their merger agreement and $4 billion special cash dividend.**

Albertsons and Kroger announced the merger agreement and special dividend in a joint press release and investor presentation on October 14.  In discussing their arrangement, Albertsons and Kroger revealed that the $4 billion "special cash dividend" was "part of the transaction."   Press Release (Oct. 14, 2022), https://tinyurl.com/ypkx8dxf.   The merger's "Consideration," they explained, included that "Albertsons will pay a special cash dividend of up to $4 billion to its shareholders, which is expected to be approximately $6.85 per share."   Kroger-Albertsons Investor Presentation 6 (Oct. 14, 2022), https://tinyurl.com/4876dmzh; *see* Krogeralbertsons.com, *Investor Information* (last visited Dec. 30, 2022) (noting that the "special cash dividend" is one of their agreement's "Key Terms"), https://tinyurl.com/454abevk; Kimco Realty Press Release (Oct. 14, 2022) (noting

that "part of the cash consideration" for the merger "will be paid in the form of a $6.85 per share special cash dividend"), https://tinyurl.com/mukns7nk.

## 2.    Procedural Background.

The District of Columbia, California, and Illinois sued Kroger and Albertsons and sought a temporary restraining order on November 2, 2022.  They alleged that Kroger and Albertsons's special dividend and related credit and debt restrictions violate federal, state, and District antitrust law.  Compl. ¶¶89-104.[2]

### A.    The district court denies the temporary restraining order.

The district court denied the TRO in a bench ruling, holding that appellants had not shown a likelihood of success on the merits or irreparable harm "for essentially the same reasons."  Tr.66.  Despite the merger agreement and Albertsons and Kroger's public statements, the court found "no evidence of an agreement" on "the pre-closing dividend."  Tr.66-69.  The court further ruled that, even if an agreement existed, there was "insufficient evidence" of anticompetitive harm as appellants had not shown "that after payment of the preclosing dividend, Albertsons will have insufficient liquidity to compete."  Tr.69-70.  In the court's view, "the

---

[2]    The State of Washington filed a similar but narrower claim against Albertsons and Kroger in its own courts on November 1, 2022. *Washington v. Albertsons Cos., Inc.*, No. 101530-5 (Wash. Super. Ct.).  The state court in that case entered a TRO on November 3 enjoining the $4 billion special dividend.  That TRO will remain in force until January 17, 2023, pending review in the Washington Supreme Court. *See* Attachment (Public Letter of the Washington Supreme Court 2-3 (Dec. 28, 2022)).

special dividend is consistent with Delaware law," "Albertsons generates significant excess cash flow," and "neither Kroger nor Albertsons has an incentive to economically weaken Albertsons." Tr.70-71.

Given those determinations, the court held that the "other two [TRO] factors in my view aren't particularly critical." Tr.73. Yet the court ruled that a TRO "obviously" would "harm Albertsons" and "at least certain shareholders." Tr.73. And it held without explanation that a TRO was not "in the public interest." Tr.73.

**B.    The district court denies the preliminary injunction.**

The district court denied appellants' preliminary injunction motion in a decision that incorporated the TRO ruling. The court rejected appellants' new evidence of concerted action and held that any agreement on the special dividend would not be anticompetitive. Dkt.69 at 2-3. In the court's view, Albertsons and Kroger's arrangement was unlikely to harm competition because, even after paying the special dividend, Albertsons could meet its liquidity needs through "projected revenue" and the "revolving credit facility." Dkt.69 at 3-4. The court did not expressly address irreparable harm, the equities, or the public interest.

Appellants moved for an injunction pending appeal and an emergency administrative injunction in this Court and the district court, both of which were denied. Dkt.72. Kroger and Albertsons cross-moved for summary affirmance.

**DISCUSSION**

**I.    Appellees Cannot Meet This Court's Stringent Standard For Summary Affirmance Given The Erroneous Decision Below.**

Summary affirmance is rarely granted. *Webster*, 49 F.4th at 566 n.1. It is warranted "only where" movants show that "the merits are so clear plenary briefing, oral argument, and the traditional collegiality of the decisional process would not affect the Court's decision." *Am. Petroleum Inst. v. EPA*, 72 F.3d 907, 914 (D.C. Cir. 1996) (internal quotation marks, brackets omitted); *see Doe v. McMillan*, 442 F.2d 879, 881 (D.C. Cir. 1971) (denying summary affirmance where "appeal raises difficult questions"). Here, in contrast, the district court's decision was clearly wrong as a matter of law and fact, and full briefing and oral argument are necessary to decide the important issues presented. *See Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011) ("[O]ur review of the district court's denial of a preliminary injunction is for abuse of discretion, but our review of legal issues is *de novo*."). The motion for summary affirmance should be denied.

**A.    Appellants are likely to succeed on the merits of their antitrust suit.**

The district court's antitrust analysis contravenes settled precedent and is belied by the evidence in this case. The court found no likelihood of concerted action despite Albertsons and Kroger's written merger agreement and their own admissions that the $4 billion dividend is "part of" that "transaction" and indeed one of its "Key Terms." *See*, pp. 7-8, *supra*. The court then compounded that error in failing to

10

recognize that Albertsons and Kroger's combination distorts the competitive process by artificially restricting Albertsons's ability to compete through a cash-depleting dividend combined with onerous credit and debt restrictions.

> 1.    The challenged arrangement between Albertsons and Kroger constitutes concerted action among direct rivals.

The combination here arises directly from Albertsons and Kroger's merger agreement.  As the district court recognized, the credit and debt restrictions are undisputedly part of the written merger agreement.  Tr.69.  Those provisions, the court noted, restrict "Albertsons' ability to undertake certain financial transactions," and they are, "in fact, agreements" "between Kroger and Albertsons."  Tr.69.  That is concerted action by any definition.  *See, e.g.*, *Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137, 1143 (10th Cir. 1997) (en banc) ("To hold otherwise would be to read the words 'contract' and 'combination' out of section 1.").

The same is also true of the $4 billion special dividend.  In agreeing to buy Albertsons, Kroger "approved and declared advisable" the merger agreement and all "other transactions contemplated" by that agreement.  Agreement 1, 21 § 1.2(a), (j). The $4 billion special dividend is undoubtedly a transaction "contemplated" by the merger agreement since Albertsons declared the dividend in that agreement and the consideration for the merger is tied to the special dividend.  Agreement 1, 3, 13-16 § 1.1.  The district court thus erred in finding "no evidence of an agreement between

Albertsons and Kroger to pay the pre-closing dividend." Tr.66. The evidence was printed on the first page of Albertsons and Kroger's written contract.

The district court also erred in concluding that "nothing in the merger agreement obligates Albertsons to" pay the special dividend. Tr.67. For one, the agreement memorializes Albertsons's declaration of the dividend, which creates an obligation for Albertsons to pay it if lawful to do so. Agreement 1. For another, the agreement specifies that if the merger closes before the special dividend is paid, then Kroger "shall cause" Albertsons "to pay" it. Agreement 31 § 3.3(i). The merger agreement thus refutes the district court's erroneous conclusion that, if "Albertsons did not pay the dividend or decided to pay a smaller amount, Kroger would have no right to require its payment." Tr.67-68.

This analysis is borne out by Albertsons's and Kroger's prelitigation statements, most of which the district court ignored. From the beginning, Albertsons and Kroger admitted that the "special cash dividend" is "part of the transaction," Press Release, and that it serves as part of the merger's "[c]onsideration," Investor Presentation at 6. And they continue to describe the "special cash dividend" as one of their agreement's "Key Terms." Krogeralbertsons.com, *Investor Information*. Such statements refute Albertsons's and Kroger's post-litigation denials, which the district court erroneously treated as "essentially unrebutted," Tr.68.

12

Nor does it matter whether Albertsons's and Kroger's prelitigation admissions could be viewed as "consistent with" the absence of "an agreement" on the special dividend. *Cf.* Dkt.69 at 2-3; Tr.67. Concerted action exists as a matter of law when competitors execute a written agreement that covers the material terms of an anticompetitive scheme, regardless of whether other evidence "exclude[s] the possibility of independent action." *Robertson v. Sea Pines Real Est. Cos., Inc.*, 679 F.3d 278, 289-90 (4th Cir. 2012) (internal quotation marks omitted). So, contrary to the district court's flawed ruling, none of Albertsons's or Kroger's self-serving declarations can "weigh against" the existence of concerted action here. Tr.68-69.

Equally immaterial to the concerted action inquiry is whether "'[t]he authority to declare and pay the preclosing dividend rests solely with Albertsons.'" Tr.68. After all, even members of a price-fixing cartel often retain sole authority to declare and set their own specific prices, yet that does not obscure the existence of their conspiracy, much less suggest the total absence of concerted action. *See, e.g.*, *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647-50 (1980). To the contrary, the Supreme Court has long held that concerted action exists even if "one of the means used to effectuate" a combination appears to involve "independent action." *Poller*, 368 U.S. at 468-69. Here, given Kroger and Albertsons's continued admission that the $4 billion dividend is one of the merger agreement's "Key Terms," *see* pp. 7-8, *supra*, it is irrelevant whether the special dividend can be

viewed in isolation as unilateral.  The dividend is "part and parcel of" a horizontal combination—and "one of the means used to effectuate" it—and therefore constitutes concerted action as a matter of law.  *See Poller*, 368 U.S. at 468-69.

> 2.    The challenged arrangement between Albertsons and Kroger unreasonably restrains trade under any standard.

While the district court did not indicate which framework it purported to apply, Albertsons and Kroger's combination fails antitrust scrutiny under quick-look review or the rule of reason.  *See Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 36 (D.C. Cir. 2005) ("At bottom, the Sherman Act requires the court to ascertain whether the challenged restraint hinders competition.").

> a.    Albertsons and Kroger's scheme fails quick-look review.

The "anticompetitive character" of the special dividend scheme requires "no elaborate industry analysis."  *IFD*, 476 U.S. at 459.  The scheme will strip Albertsons of nearly all cash-on-hand while simultaneously restricting its ability to raise additional money during an economic downturn.   Agreement 1, 59-62 § 6.1; Compl. ¶¶56-72, 86-88; Weisbach Decl. ¶¶13-25.  Also, in requiring Albertsons to "reasonably consult[]" with Kroger before refinancing any debt over $100 million, the agreement calls for direct rivals to consult on whether and how one of them finances its competitive enterprise.  Agreement 59-62 § 6.1.  It requires only "a rudimentary understanding of economics" to realize that such an arrangement will "have an anticompetitive effect."  *CDA*, 526 U.S. at 770.

The district court erred in concluding otherwise, even if "Albertsons generates significant excess cash flow," Tr.70-71, and even if "Albertsons's projected revenue is sufficient to satisfy its projected liquidity needs," Dkt.69 at 3.  As the Supreme Court has held, "it is not necessary to show that the challenged arrangement suppresses all competition." *Paramount Famous Lasky Corp. v. United States*, 282 U.S. 30, 44 (1930).  It is enough that rivals agreed, for example, to stop competing on certain contractual terms.  *Id.* (arbitration clauses).  Or that they agreed to stop offering one type of discount.  *Catalano*, 446 U.S. at 644-50 (interest-free credit).  Or that they agreed to withhold a particular service.  *IFD*, 476 U.S. at 455-66 (forwarding x-rays to insurers).  Or that they agreed for a brief period to not advertise certain products.  *Polygram*, 416 F.3d at 31-32, 35-38 (ten-week moratorium).  In each of those cases, the challenged arrangement affected only one discrete element of the competitive process, and in yet in each of those cases, the Supreme Court and this Court correctly declared the arrangements anticompetitive as a matter of law.

The question, then, is not whether Albertsons will stay afloat or even remain competitive.  It is whether the special dividend scheme will suppress competition by diminishing Albertsons's competitiveness compared to its previous status.  *See United States v. Union Pac. R.R. Co.*, 226 U.S. 61, 85-86, 88 (1912) (prohibiting arrangement that restricted "the free operation of competition theretofore existing").

15

The district court's failure to squarely address that dispositive issue precludes summary affirmance by itself.

The district court also got the economics wrong in concluding that "plaintiffs have failed to show that after payment of the preclosing dividend, Albertsons will have insufficient liquidity to compete."  Tr.70.  Albertsons needs $6 billion in liquidity and, after paying the special dividend, it will have at most $3 billion on hand: $500 million in cash and $2.5 billion in the credit revolver.  Tr.71.  While the district court believed that Albertsons "may be able" to cover this $3 billion liquidity gap, the court offered no sound economic basis for that conclusion.  Tr.71.  On one hand, it relied on Albertsons's estimate of $4.4 billion in earnings before interest, taxes, depreciation, and amortization (EBITDA).  Tr.71.  On the other, it looked to Albertsons's "expected operating cash flow" of $3.3 billion.  Dkt.69 at 3.

Yet both metrics ignore the costs of generating the liquidity they estimate.  By definition, the EBITDA estimate refers to Albertsons's earnings *before* it pays interest, taxes, and other expenses.  Likewise, the operating-cash-flow estimate overlooks that Albertsons's net income for the past three fiscal years has been a fraction of its revenue: $1.6 billion on $71.9 billion in 2021; $850 million on $69.7 billion in 2020; and $466.4 million on $62.5 billion in 2019.  Weisbach Decl. ¶16.  Thus, Albertsons's expected revenue of $75 billion for 2023 will likely generate

only about $1.7 billion in net income, far short of what it needs to compete as it currently does.  Weisbach Decl. ¶17.

Even aside from those errors, the district court failed to recognize that the merger agreement itself may deepen Albertsons's liquidity troubles far beyond $3 billion.  Without Kroger's "prior written consent," Albertsons cannot access the credit revolver—let alone draw all remaining $2.5 billion from it—unless doing so would be "in the ordinary course of business consistent with past practice."  Agreement 59-62 § 6.1(n).  The district court found such borrowing likely because Albertsons had purportedly used the revolver "several times in the last few years."  Dkt.69 at 3-4.  Yet the only instances it identified were a $2 billion loan at the start of the COVID-19 pandemic and the $1.5 billion loan for the special dividend— neither of which suggests that maxing out the credit revolver would be "in the ordinary course of business" or "consistent with past practice."  Indeed, COVID-19 was a global pandemic, and the $4 billion special dividend is 57 times greater than Albertsons's usual dividends and part of a supermarket mega-merger.  It would thus be anything but "ordinary" for Albertsons to deplete the entirety of the credit revolver when reckoning with liquidity shortfalls caused by the special dividend.

Also erroneous was the district court's view that the credit revolver's "variable interest rate" of LIBOR plus 1.25% to 1.5% mattered little since the "interest payments themselves are part of Albertsons's liquidity needs."  Dkt.69

at 3 4.  That analysis fails to account for the fact that the LIBOR rate—which already hovers around 5-6%—is expected to increase soon.  Jerome H. Powell, *Inflation and the Labor Market*, Speech at the Hutchins Center, Brookings Institution (Nov. 30, 2022), https://tinyurl.com/yc73ssy5.  Considering Albertsons rarely accessed the revolver back when LIBOR rates were almost zero, it cannot reasonably be said that it is likely to do so once the overall variable interest rate exceeds 7-8%.  This simply underscores the seriousness of the liquidity crunch that Albertsons will face after paying the $4 billion special dividend, and it highlights the error of the district court's conclusion that Albertsons's predicament will not affect competition.

Nothing in this analysis changes, moreover, just because the special dividend was declared in accordance with Delaware law or approved by Albertsons's board and advisors.  *Cf.* Tr. 69-73.  Compliance with state law is not a defense to federal antitrust liability.  *See IFD*, 476 U.S. at 465; *Union Pac.*, 226 U.S. at 85-86.  And even "wholly innocent" acts may violate antitrust law if "used to accomplish" or "give effect to" an anticompetitive combination.  *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946).  Delaware law and principles of corporate governance are thus beside the point, and the district court erred in relying on them.

> b.   Albertsons and Kroger's scheme fails rule-of-reason review.

The special dividend scheme also fails under the rule of reason.  Given the anticompetitive effects of Kroger and Albertsons's combination, the rule-of-reason

inquiry ends at step two, as Kroger and Albertsons have not carried their "heavy burden" to identify a procompetitive justification. *See NCAA*, 468 U.S. at 113. The same is true even if the analysis proceeds to step three, since Kroger and Albertsons could have used substantially less restrictive means, by, for example, leaving Albertsons fully funded during merger review and paying shareholders from the sale proceeds, or at the very least, paying a dividend without restricting Albertsons's credit and debt-refinancing capabilities. *See Alston*, 141 S. Ct. at 2160-62.

The district court failed to reach either of these issues. It instead fixated on Albertsons's and Kroger's "incentives," believing it would "not make sense to me" for them "to economically weaken" Albertsons during merger review. Tr.71-72. But as the court admitted, that "is not a necessary component of [appellants'] claim." Tr.71. Civil antitrust violations "can be established" solely through proof of "an anticompetitive effect." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 436 n.13 (1978). Plaintiffs need not show that defendants had "the same motive or goal," or that a challenged restraint would serve each defendant's "economic interests." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 204-05 (4th Cir. 2002) (citing *Spectators' Comm'n Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 220-22 (5th Cir. 2001)). Denying preliminary injunctive relief based on Albertsons's and Kroger's purported "incentives" was therefore erroneous.

The district court also got the incentives wrong. Weakening Albertsons lets Kroger extract supracompetitive profits with less fear that Albertsons will discipline it on price, service, or quality before merger review concludes. Albertsons, too, had reasons to accept this plan since its controlling shareholders will be handsomely rewarded by the special dividend either way, and thus the anticompetitive harms are worth the spoils. *See Dickson*, 309 F.3d at 204 (holding that an anticompetitive arrangement was not "against [defendants'] economic interests" where they "received financial and other benefits in exchange for entering into" it).

The district court's analysis was further impaired by its erroneous view that "Albertsons and Kroger are only direct competitors in a few markets." Tr.72-73. Albertsons and Kroger in fact compete directly against each other in a substantial number of neighborhoods, wards, and towns in the District, Illinois, and California. Compl. ¶¶9-10, 35-38, 41, 51-53, 78-85. This includes the Adams Morgan neighborhood in Northwest DC, where a Harris Teeter supermarket (owned by Kroger) operates only a third of a mile from a Safeway supermarket (owned by Albertsons). Compl. ¶15. It also includes many urban, suburban, exurban, and rural areas throughout Southern California and Northern Illinois. Compl. ¶¶35-37, 84-85. Indeed, the merger agreement itself recognizes so much direct competitive overlap between Albertsons and Kroger that it provides for the divestiture of hundreds of stores in hopes of securing regulatory approval. Agreement 13 § 1.1.

**B.      Irreparable injury will result absent a preliminary injunction.**

The district court's irreparable harm ruling rests on "essentially the same" flawed conclusion as its likelihood-of-success determination—*i.e.*, that the special dividend scheme is not "likely to result in a lessening of competition."  Tr.72-73. That determination was wrong as a matter of law on the merits, and it is doubly wrong as a basis for deciding irreparable harm.  The record shows that, without a preliminary injunction, competition in the supermarket industry will be irreparably harmed by higher prices that can never be recouped.  *See FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1091 (D.D.C. 1997).  That is particularly so considering Albertsons will pay the special dividend as soon as possible, and in doing so potentially moot appellants' claims.  *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (noting that "harm is irreparable" where "there can be no do over" (internal quotation marks omitted)).  Given the serious antitrust concerns raised by Kroger and Albertsons's special dividend scheme, appellants' antitrust suit should not be mooted before it can be fully addressed and decided.

**C.      The equities favor preliminary injunctive relief.**

Despite dismissing the equities as not "particularly critical," the district court held that an injunction "obviously" would "harm Albertsons" and "at least certain shareholders."  Tr.73.  That decision was legally erroneous: "Private equities do not outweigh effective enforcement of the antitrust laws."  *FTC v. H.J. Heinz Co.*, 246

F.3d 708, 727 n.25 (D.C. Cir. 2001) (internal quotation marks omitted). Preliminarily enjoining the special dividend scheme will preserve Albertsons's cash reserves and ensure the competitive status quo without delaying the proposed merger or exposing Albertsons to any serious threat of liability.  *See Selly v. Fleming Coal Co.*, 180 A. 326, 328 (Del. Super. Ct. 1935) (recognizing a right to payment only "of a *lawful* dividend" (emphasis added)).  Albertsons's shareholders, moreover, can be promptly paid in full should defendants prevail, and in any event, the merger agreement itself recognizes that the special dividend may not be paid until after the merger closes.   Agreement 31 § 3.3(i).   Kroger, Albertsons, and Albertsons's shareholders will therefore suffer no harm from a preliminary injunction.

### D.     A preliminary injunction is in the public interest.

The district court's one-sentence statement that relief was not "in the public interest," Tr.73, was as erroneous as it was conclusory.  *See Gordon*, 632 F.3d at 725 ("[T]he district court erred by addressing in conclusory fashion the fourth factor— the public's interest.").  Preserving the status quo during the pendency of this suit will ensure continued competition in the supermarket industry, whereas denying relief would benefit only those shareholders who will reap the private windfall of a hastily paid $4 billion dividend.  The former undeniably furthers the strong public interest in effective antitrust enforcement and consumer welfare; the latter advances no cognizable public interest of any sort.

22

## CONCLUSION

The Court should deny the cross-motions for summary affirmance.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

/s/ Bryan J. Leitch
BRYAN J. LEITCH
Assistant Attorney General
Bar Number 1016484
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6524
(202) 741-0649 (fax)
December 2022                    bryan.leitch@dc.gov

**CERTIFICATE OF COMPLIANCE**

I certify that this opposition complies with the type-volume limitation in Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5033 words, excluding exempted parts. This opposition also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Bryan J. Leitch
BRYAN J. LEITCH

# ATTACHMENT

# THE SUPREME COURT
STATE OF WASHINGTON

**ERIN L. LENNON**
SUPREME COURT CLERK

**SARAH R. PENDLETON**
DEPUTY CLERK/
CHIEF STAFF ATTORNEY



**TEMPLE OF JUSTICE**
P.O. BOX 40929
OLYMPIA, WA 98504-0929

(360) 357-2077
e-mail: supreme@courts.wa.gov
www.courts.wa.gov

December 28, 2022

**LETTER SENT BY E-MAIL ONLY**

Karl David Smith
Tera Marie Heintz
Noah Guzzo Purcell
Office of the Attorney General
P.O. Box 40100
Olympia, WA 98504-0100

Jonathan A. Mark
Amy Nicole Linscheid Hanson
Miriam Rose Stiefel
Rachel Athena Lumen
Valerie Kay Balch
Luminita Nodit
Christina Monique Black
Brooke Howlett Lovrovich
Dalvin Kingsely Williams-Yarbrough
Holly Anne Williams
Washington State Attorney General
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188

Miles C. Bludorn
Michael Rosenberger
Gordon Tilden Thomas Cordell LLP
600 University Street, Suite 2915
Seattle, WA 98101-4172

John Douglas Cadagan
Gordon Tilden Thomas & Cordell
421 W. Riverside Avenue, Suite 670
Spokane, WA 99201-0417

J. Robert Abraham
Shannon Rose Selden
919 Third Avenue
New York, NY 10022

Shannon Rose Selden
919 Third Avenue
New York, NY 10022

Stephen L. Ascher
115 6th Avenue
New York, NY 10036

Andrianna Kastanek
Gabriel K. Gillett
353 North Clark Street
Chicago, IL 60654

Aaron Edward Millstein
Pallavi Mehta Wahi
Christopher M. Wyant
K&L Gates LLP
925 4th Avenue, Suite 2900
Seattle, WA 98104-1158

Matthew Wolf
Michael B. Bernstein
Sonia Kuester Pfaffenroth
Jason Ewart
Arnold & Porter Kay Scholer LLP
601 Massachusetts Avenue NW
Washington, DC 20001

Mark A. Perry
2001 M Street NW, Suite 600
Washington, DC 20001

Adam B. Banks
767 Fifth Avenue
New York, NY 10153

Page 2
No. 101530-5
December 28, 2022


Leah S. Martin
Edward D. Hassi
801 Pennsylvania Avenue NW
Washington, DC 20004

Re:    Supreme Court No. 101530-5 - State of Washington v. Albertsons Companies Inc., et al.
       King County Superior Court No. 22-2-18046-3 SEA

Counsel:

       This letter will address the various filings received over the past week.

Accelerating Review

       As discussed in a previous letter, the Court was unable to act on the "ALBERTSONS'
EMERGENCY MOTION TO MODIFY COMMISSIONER'S RULING" as a motion to modify
due to the timing and schedule of the Department of the Court.  However, in the interests of
judicial efficiency, the motion will be construed as a motion to further accelerate review of this
matter, and that motion is granted as follows.

       The motion for discretionary review and the statement of grounds for direct review will
be set for consideration by the Court at a special En Banc conference set on January 17, 2023.
They will be considered without oral argument.  To facilitate this, the following expedited
briefing schedule is set: **any answer to the motion for discretionary review or the statement
of grounds for direct review should be served and filed by January 4, 2023.  Any reply to
the answer to the motion for discretionary review should be served and filed by January 9,
2023.  Any amicus brief should be served and filed by January 4, 2023.  Any objection to an
amicus brief should be served and filed by January 5, 2023.  Any answer to an amicus
motion should be served and filed by January 9, 2023.**

Motion to Modify Redesignation

       On December 27, 2022, the Court received the "Motion to Modify Ruling Redesignating
Notice of Appeal" and the "Motion to Accelerate Review of Motion to Modify Ruling."  The
motion to accelerate asks that the motion to modify be set at the same En Banc conference as the
request for direct review. The motion to accelerate review of the motion to modify is granted as
follows.  The motion to modify will be set for consideration by the Court on the special En Banc
conference on January 17, 2023.  **Any answer to the motion to modify should be served and
filed by January 4, 2023.  Any reply should be served and filed by January 9, 2023.**

Motion to Seal

       On December 27, 2022, the Court received the "Motion to Seal State's Motion for
Discretionary Review."  The motion will be set for consideration by the court on the special En
Banc Conference on January 17, 2023.   I am entering a temporary ruling sealing the State's
unredacted motion for discretionary review until the Court has the opportunity to consider the

Page 2
No. 101530-5
December 28, 2022


motion to seal.  **Any answer to the motion to seal should be served and filed by January 4, 2023.  Any reply should be served and filed by January 9, 2023.**

                                    Sincerely,

                                    Erin L. Lennon
                                    Supreme Court Clerk


ELL:bw

cc:    Aaron M. Streepy
       SaNni M-K. Lemonidis